Case No. 25-1271, John Griswold v. Trinity Health MI et al. Arguments not to exceed 15 minutes per side. Ms. Henderson, you may proceed on behalf of the appellants. Good morning, may it please the court. Callie Henderson on behalf of the appellants, the Livingston County Sheriff's Jail Deputies. May I please reserve three minutes for rebuttal? May. Thank you. This case is grounded in an issue that is unsettled and is currently being re-evaluated by this circuit, scheduled for en banc re-hearing coming up in the next month, and that's deliberate indifference. Qualified immunity then compounded the confusion in this case in the district court, and that confusion produced two main errors below. The plaintiff has since compounded that by reversing course in this court, and I will take those three points in turn. First, that no clearly established law in 2018 put the jail deputies on notice that plaintiff had an objectively serious medical need that required them to override a physician's medical opinion when Mr. Griswold returned from the hospital to the jail 15 minutes after leaving the hospital. Because he vomited once and became lethargic and slept or didn't respond overnight, that did not put those deputies on notice that there was an objectively serious medical need. I mean, you can see on the video he's vomiting. Isn't it crazy to leave him sitting in his own vomit? Your Honor, in a jail I would say no. The deputies did go in, they checked on him, he was responsive, he was breathing. But clearly when they went in they could smell that he had vomited. I don't know if at the point, I can't remember when they went in the first time, if you could see the vomit. But why wouldn't you just clean it up at that point? Your Honor, I have two points on that. First is that the record doesn't establish that they all had subjective knowledge that he had vomited. And the second would be... Some of them did. I mean, I think what Judge Spahr is asking is, come on. The guy threw up. Could we clean it up a little bit? Is that okay? Well, to the extent, Your Honor, when he comes back, he's already refusing to cooperate with them when he walks in. That's why we see him in his clothing. He won't change out. He won't cooperate. So it's that when they go in to check on him again, he's not cooperating with them, doesn't want to change out. He also makes no indication in that video that he's got any issue with what's going on. Contrary to what the district court found, that he can't clean himself off, he does. He does clean himself off. He adjusts his position several times. He adjusts his clothing. He bends his legs, crosses his legs. So he's moving. He's responsive to his comfort in that moment. So for the deputies to conclude that they have to force this man, who already did not want to change out of his clothing, to force him to change out when he's now vomited one time, I think that's unreasonable under these circumstances. How do you deal with the Burwell case? The Burwell case, Your Honor, I think is actually helpful when we look at the clearly established law of the time because those factual circumstances are different than what we're dealing with here. In Burwell, the individual was showing outward signs of his internal discomfort. He was grabbing his stomach. He was demonstrating that he was trying to sit on the bench. He fell off multiple times and then put himself back on the bench. We don't even have that with Mr. Griswold here. There's no signs that he's lifting his arm and he can't get to his face. Some type of outwardly objective sign that he is struggling with his movements, like we had in Burwell. And then in Burwell, the individual is found prone, stomach down, on the ground, in the pile of vomit, which I think is another error that the district court committed here where the district court found that Mr. Griswold was found prone in a pile of vomit. He absolutely was not prone in a pile of vomit. He was sitting upright, same way he had been positioned all night long. Sitting upright is a little bit of an overstatement. I mean, he slid down. He did. He did slide down, Your Honor, same way that we all might when we're sitting on a cement floor in a jail overnight. And that, I think, is a key context. He's elevated the entire time. I'm sorry, Your Honor? His head is elevated the entire time. Yes, Your Honor. He's never lying in a pool of vomit face down. Correct, Your Honor. So that's how you, I mean, other than the other points you gave, the rocking and everything else and the pain, but mainly you're saying he's either sitting up or his head is up. Yes. Distinguishes. And I think there's one other key point here, is that Mr. Griswold was seen by a physician prior to coming to the jail because the jail had, he came in once to the jail. The jail is the only entity in this entire case that noticed a problem with Mr. Griswold. The jail sent him to get medical clearance. He goes to the hospital. He's seen by a physician. He returns with a note saying, this individual has medical clearance for your jail, such that to suggest to the deputies who see Mr. Griswold, even when he returns, he's got his arms crossed, he's not cooperating, he's not responding to them, he's got to lean up against the wall, to say that those situations of unresponsiveness require the deputies to undercut the physician, to guess against what that physician is telling them. What about the fact that I think when Ms. Whitman gets up here, she's going to say, well, that medical release that they got included a warning that if the defendant vomits, you need to seek help. That's not exactly what that medical warning said. What that medical warning said was if there are recurrent episodes of vomiting, he should be reassessed for concerns of a head injury, and that was in relation to his nasal fracture. What we know now is he was suffering from an overdose. There are no instructions on those discharge instructions that warned the deputies to be on the lookout for signs of an overdose. It warned them... No, Your Honor. None of the deputies actually reviewed those discharge instructions. What we have is that all but one of the deputies knew that he had gone to the hospital to get clearance and that he had been cleared. But didn't they review the discharge instructions once they know he's gone to the hospital? They have medical on site, which is one of the things that I think is missed in the context. But how often does medical... I looked at your cell check thing that you provided for the district court, the joint list. It doesn't indicate to me, at least that I saw, you can correct me, that medical was checking on him regularly and indicates the guards are checking on him regularly. So how is medical to know... What do we do with that? The testimony in this case, which wasn't really brought before the district court, was that medical is on site. The deputies give the paperwork to medical. They put it in a bin right there. In the video, you see the intake area. Medical is right across the hall from there. And there is actually a note on Mr. Griswold's medical intake at 10.30 that evening from a nurse noting that she's aware that he's back. So say the medical sheet, instead of said recurring vomiting, said if he vomits because of his nasal fracture or whatever, if he vomits, he should be transported back to the hospital. The guards aren't going to know. They didn't clean it up. Did they communicate that to medical? There's no testimony here that they did communicate that to medical. And that's actually, that would probably be an important distinction if that's the case that we had. But I'd also posit that one episode of vomiting alone under these circumstances does not show objective signs of a serious medical condition, especially given his reaction to the vomiting, which is that he really has no, he demonstrates no concern for it. I may agree with you on that, but I'm more concerned with the fact that the guards don't even study the medical document to know what to look for to communicate to medical who isn't performing self-checks. Why isn't, I mean, maybe it doesn't result in liability, but why isn't that problematic? I mean, it wouldn't take long for either medical to summarize or them to read. I mean, here there were just a few statements that were critical. If you're going to perform self-check, shouldn't you know what to look for? Your Honor, I believe that when medical does get that paperwork, if there are things that the deputies need to be on alert for, or if medical decides they need to be on alert for, those things are communicated. But even when we look here, these are just generic instructions, and I agree that somebody needs to know these things, and the proper party there is the medical. It's the nurse. It's the nurse that's on duty at the jail that receives this paperwork, not the deputies who are specifically not trained to be making these. I don't know if I'm saying that, Your Honor, but I'm saying it definitely wasn't the deputies in this situation. I don't want to make those litigation determinations for them. But here, where we've got an individual who's not showing these outward signs, and then especially when we look to the subjective knowledge of each of these individuals, that again, I think, was an error of the district court to impute knowledge. And then see her come in, check in, and then they move him out. Is that the only time? That we see a nurse in a video? Yes, Your Honor. Yes, it is. Going back, though, I believe that two judges on this panel, Judge Gibbons, Judge Larson, yourselves, just issued an opinion that provides the correct path to take in this case as well. If we look to the level opinion that came out, I believe, 20 days ago, wherein the court found that because of how unsettled all of the case law and this deliberate indifference is, it's easier for us to turn to that clearly established fraud and look at the law as it existed at the time. And here, when we look at the law as it existed in 2018, it was not clearly established that the deputies could not rely on the medical clearance, that these facts that they were witnessing in those moments amounted to a serious medical condition that they had to respond to. Burwell, in that theory, doesn't even count, because Burwell is 2021. Correct, Your Honor, and the district court did rely on that. The district court relied on several opinions that post-date this incident in 2018, such that I would ask that this panel follow the Lovell decision and also grant these deputies qualified immunity. Any further questions? Thank you, counsel. Thank you. Good morning. May it please the court. Beth Whitman appearing on behalf of the plaintiff. So I'll dive in, I think, where this court finished with respect to the qualified immunity issue. So we do have case law that addresses this issue. The Green case is a case that involved care that occurred in 2017, and in that opinion, this court held that it involved a mental health professional. But to ask that question, or I'm sorry, in that end, the plaintiff in that case experienced a clearly established, life-threatening medical condition for at least two days prior to his incapacitation. So even in that situation where we have, you know, prior to the Brawner decision and everything else, this is still a medical, a clearly established right. Did you cite this Green case to the district court? I thought you relied on Blackmore and Burwell. In the district court, I don't recall. I don't recall if Green was cited. Okay, but you did raise it in your briefing. Absolutely, yes. Also, I thought in the district court it agreed Brawner didn't apply, right? Brawner, there was statements made at the hearing, yes, that they were pre-Brawner, and I recognize the fact that this is something that I have raised in the appellate court. I recognize that this is a highly contested issue in the circuit. But as a Waller binding? Waller, yes. Well, there have been other cases that have indicated that this Brawner decision should, in fact, apply. I recognize that those are pre-Waller. But Waller definitively decides to correct. It did say that. It did. But again, this issue, as sister counsel has indicated, this issue is, again, up in front of this court. It's an en banc issue. Objective prong. Pardon? But you briefed this case on the objective prong, not the subjective prong. And doesn't Brawner-Farmer? The Brawner-Farmer dichotomy goes to the subjective prong. It does go to the subjective prong. That is correct. And I wanted to make it clear, because I know opposing counsel had indicated that we had given up this issue with respect to the pre-Brawner standard applying, and that is not at all the case. I had argued that Brawner should apply, but even if it doesn't, it makes no difference in this case as a result of the fact that the trial court, in fact, applied the pre-Brawner standard. Can we talk about the objective evidence? Sure. Because the medical report says recurring vomiting. Correct. Here the guards are only aware of one vomit, so why did they have an obligation to do anything? Because this court has indicated on multiple occasions that even one episode of vomiting is indicative of a serious medical impairment. Alone? Yes. But, number one, nobody read that. When he returned to the jail, there was no medical assessment that was done at the jail. There was also, he wasn't even booked at this point, so there were not even questions that were asked of him at the time that he returned to the jail. Right, but they knew by returning to the jail, because they sent him to the hospital, that he was cleared. And so, and Lombard, I know it's unpublished, but seems to indicate that we take all, which I assume you want us to, all the objective evidence. Yeah. And that includes the good and the bad, and the bad is that it said recurring vomiting. I mean, inmates that come in, in the drunk tank and elsewhere, regularly vomit. I mean, that is a very common occurrence, especially in a sober tank or whatever. Here he vomits once. That's not Burwell, where he's rocking, he's flaming his vomit, all those things. No, I think this is completely on par with Burwell. He was unsteady on his feet. He had to be helped when, you know, sitting back down into the thing. Rocking and suffering in pain, and you could see it on the video.  And then he was laying in his vomit. And that's what Mr. Griswold was doing as well. No, but Mr. Griswold has his head up. He does. It's a lot of video. It is a lot of video, it is. He has his head up. He slowly slides down the wall, and I think it's important. Over a period of 13 hours. Over a period of 13 hours. And that's common when you're sleeping. It could be, except, again, he vomits all over himself and does nothing to extricate himself from that position. He wipes off his vomit. Yeah, he does. But I think that then would be an issue of fact for the jury. Because, again, he is unsteady on his feet. He is not moving himself from this position. He is also, when the EMS does finally come, and they say, you know, the other point I wanted to make too, his abdomen is increasingly distended as he's sliding down the wall. And then EMS comes, and they find a copious amount of vomit in his mouth and in his nose. So that indicates, I think, that this is an ongoing thing that is happening. It is not just a single episode. It is something that's going on. Griswold, we don't know if he vomited a second time and swallowed it because he was taking an antidepressant, which they didn't know. They did not know, no. And the antidepressant is what would cause your muscles to relax such that the vomit wouldn't come out. Ulcer medication, from my understanding, wouldn't do that. And obviously the medical, or the autopsy report, indicates that he had a severe drug toxicology, not to the ulcer medication that it was that they thought that he took. It was a drug toxin. But they didn't know that. They did not know that. They did not know that at all. They didn't know anything about what had happened at the hospital. They didn't know why he went there. They didn't know why he came back. Did the hospital report indicate he took Trazodone? No, there was nothing, nothing in the medical record. So why doesn't that exculpate the jailers rather than inculpate them? I think if they had known, like, this guy just swallowed a bottle of Trazodone, you might think differently about it. But they didn't know that. They didn't know anything. So I think that's a bigger problem. They didn't know why he had come back. They just knew that he was apparently cleared for return back to the jail. And then he's still exhibiting the same symptoms that he had before he left. He was unsteady on his feet. But the difficulty was is he had— He's unsteady on his feet at the beginning. And then, yes, he has to be helped down while he's still handcuffed. But most people would have to be helped down while handcuffed. But even after he is unhandcuffed, it's almost like he doesn't recognize that he's been unhandcuffed. They have to help him down, even under those circumstances. So he's— I don't know. I assume you've seen the sit-to-rise test, right? Like, people in their 40s and 50s have trouble getting up and down without their hands. And that may be true. But, again, you know, I think most people who are not mentally and cognitively in motor impairments have an ability to get up and down even when they're not handcuffed. And he just doesn't exhibit that. When they go to take his handcuffs off, they take them off. He has to lean over a wall to essentially hold himself up. And I think that's why another thing that makes it very similar to the Burwell decision— And it could be. But then after that is when he has the episode of the vomiting. But they didn't send him to the hospital because they thought he was necessarily drunk. And they sent back because he had a— The fact is he came back. He did. If they didn't send him to the hospital at all, I think it's a different case. But they send him. They get a clearance. They do. They have a clearance where he never shows up. But he continues to deteriorate after that. Pardon? Oh, I think there's an issue there, too. It's my understanding the hospital and those doctors are still in the case in the district court. But, again, I think that the trial court in this case held that when you look at all of the evidence, you have 13 hours where he is seated in the same position. All he does is slide further down. He has no communication with any of the officers. And that may be. But I don't know that 70 percent of them have the episodes of vomiting. I mean, they may vomit once or twice. They may. But then, again, they don't do anything at that point. They don't contact medical. There's nothing to them. They don't know why or what they're supposed to be looking for. They just know he's been cleared. And now they know that he has something else that has happened to him. But there's nothing. They do nothing. Even if they commented, contacted medical, and they said, hey, he vomited once, wouldn't medical just say he has to recur it? Is the medical release as recurrent vomiting? But that's for a, you know, a laceration. Not a laceration. I think there was a fracture, a bone fracture. They were maybe concerned, I'm thinking of concussion.  But even to a guard who read the report and saw one vomit, they wouldn't be on notice. I think they would be on notice that there is a problem because, again, this court has held repeatedly that vomiting is a sign. Is there any case in which it's vomiting alone? Vomiting alone. I feel like all the cases are vomiting and other circumstances. They're gripping their stomach. Right. They're, you know, doubled over. I think in one of them they repeatedly over a period of days request help, like send out a kite. Right. But, again, I think under these circumstances we have the distended abdomen. We have him standing. Well, we see that kind of towards the end of the video when he's sliding down the wall and kind of towards the end. And then you see his shirt pulls up. He's also trying to adjust his shirt. He's trying. He's trying to pull it back down. And you see his, well, we don't know what his stomach looked like before. I mean, he's not, you know, he's, I don't know, a guy in his 40s. He has a punch. I don't know. I don't know what he should look like. I'm not saying. I will not address that question. But I will say that I think when you watch. When you do watch the video, I think it's clear. You know, I even yesterday, I didn't rewatch the entire thing. But I did watch it at a kind of fast forward speed. And it does become much more pronounced throughout the entire evening. Not just at the end. I think at the end it's really, really noticeable. And again, there's nothing that is done. He's still showing evidence of the fact that he has vomited all over himself. Honestly, I get your point. How would a guard know? Do they go in and measure the belly? Do they?  And it's not. I didn't notice that that pronounced in looking at the video. I'll go back and look at it. Yeah. Such that it would alert me that there was an issue. Because when you sleep and you're breathing, it's going up and down. But it's not. It is a cluster of things. Which is exactly what the trial court held. In which I think Judge Larson, you indicated cases don't just have one episode of vomiting. I agree with that point. But when someone's rocking back and forth and in pain. Noticeably in pain. And then basically falls in their vomit. That's one thing that's like every lay person is going to say. Okay. That's a problem. What you're saying is they have to observe the belly getting bigger. Yes. And the fact that they know that he's unsteady on his feet. We're asking them to do much more than happens in the outside world. I mean, we're asking guards to do things that they're just not necessarily capable of doing at that point. But they need to check. I mean, their whole point is to be doing these welfare checks. That's exactly why they go in there. They're going to see. He's moving at like 4 and 5 in the morning if I recall correctly from the video. He's moving around. He's doing those things. He's moving his limbs. I don't know that he's not moving around. He stays in the exact same position. He's moving his limbs. Okay. That's fair. So I think that's fair. But, again, you have the lack of communication with the guards. You know, at one point they said his head was down. And they said, but I could see his eyes moving toward me. Well, I don't think that's a normal reaction to having somebody. These are guards who are slamming on the door or smacking the glass to try to get his attention. And he's just not reactive to anything at that point. And I think that's exactly what the district court was getting at here. You know, we have a whole series of events over this long period of time where they're looking in. They're seeing the vomit. And I wanted to make the point, too. One of the deputies had said, well, you know, we see things, you know, people might have. He could have urinated on himself or he could have had a drink at the drinking fountain. The video, the pictures that were attached as well, which I think are filed under seal, those all kind of indicate this absolutely was vomit. This is, you know, it was clear, I think, to anybody. And that's exactly what the trial court said. You know, this would have been obvious to anybody who looked by. Because, again, some of the deputies said some of them admitted that they saw that he had vomited all over himself. Even so, the one even conceding, if we say, sure, anybody would have seen that he vomited. What's the case that would tell a reasonable officer that if a person vomits one time? That is a sign of serious, a serious medical condition as opposed to, you know, he drank too much.  And I think that the best case that I have that I think is on all fours is the Burwell case. Which I know, you know, two judges on this panel were on the panel in that case as well. That one post-states the events of the question. It does. But, again, if the question is whether or not they could rely on it because there was a medical, because, again, Burwell did not involve a medical clearance issue. But, just very quickly, if I may at least make two points on that one. The Grote case, which I admit that it was also post-date on this one, it indicates that any deference to medical professionals is unreasonable when something happens after the medical professionals have made a diagnosis or indicated something. The other issue or point that I wanted to make, too, with respect to the Green case, is that the Green case says bare minimum checks after a while, it's going to violate the Constitution. And when that point happens is an issue for the jury. Okay. Okay. Thank you very much. I appreciate it. Thank you, counsel. I will be brief. I think it's clear the panel understands this issue. And I think what we just heard is the same mistakes that were made in the district court. When we're talking about clearly established law, we cannot be talking about Green. We're not talking about Burwell when we're looking at what existed in 2018. Sister Counsel just got up here, her first case that she wanted to discuss this panel was Green, a case decided in 2022. That does not clearly establish any of the circumstances those deputies faced in 2018. And I think that Judge Larson, you also touched on a matter wherein we talked about we had the medical clearance. The doctor at the hospital did not notice this issue. The doctor at the hospital saw all of these same things and sent him back and said, you have medical clearance to enter the jail. Such that now we ask these deputies who don't have all of those years of schooling to look at this man and go, oh, that doctor was wrong. You shouldn't be here. And I think this case has a unique situation where we have another law enforcement individual that got the opportunity to observe many of this same unresponsiveness, unsteadiness on his feet. And that's the Brighton police officer that brought him to the Livingston County Jail. Didn't think he needed to go to the hospital first. The jail said, no, please take him to the hospital. And then that Brighton officer stays with him at the hospital and doesn't see any problem with the doctor sending him back. And then brings him back to the jail. Does not communicate any concerns or anything to the jail to put them on notice of anything. Such that he saw those same things. So he gives us this unbiased perspective on that as well. Such that I think that this is a very important issue and this court... That Brighton officer is not a defendant. He is not, Your Honor. He is another missing party here. And so I ask that this court reverse the district court. Thank you, counsel. Thank you both for your thoughtful arguments. The case will be submitted.